## SLOAN v. UNITED STATES.

(Circuit Court, D. Nebraska. July 1, 1899.)

**1. INDIANS—SUIT FOR ALLOTMENT OF LANDS—SPECIAL JURISDICTION OF CIRCUIT COURTS.**

Under the act of August 15, 1894 (28 Stat. 305), giving any person of Indian blood who claims to be entitled to land under any allotment act or grant made by congress, or to have been unlawfully denied or excluded from any allotment or parcel of land, the right to maintain a suit therefor in the proper circuit court of the United States, and giving such courts jurisdiction to try and determine such suits, their judgments in favor of a claimant, when certified to the secretary of the interior, to have the same effect as if the allotment had been allowed by him, the jurisdiction of a court over such a suit is not defeated because the title to the land involved remains in the United States, nor is an adverse decision on the claim by the land department conclusive against the legal rights of the claimant.

**2. SAME—LANDS OF OMAHA TRIBE—ALLOTMENTS IN SEVERALTY.**

Act Aug. 7, 1882 (22 Stat. 341), relating to the lands of the Omaha tribe of Indians in Nebraska, and providing for allotments therefrom in severalty, superseded all prior acts and treaties on the subject, and all subsequent allotments are governed solely by its provisions, both as to the right to allotment and the quantity of land.

**3. SAME.**

Under said act, which provided for allotments "to the Indians of said tribe," no distinction can be made as to whether they were of full or mixed blood, or on account of the length of their residence on the reservation; and it is immaterial that an applicant for an allotment was not residing with the tribe in 1865, at the time of the treaty under which previous allotments were made. Neither is the right of an Indian who was a member of the tribe when the act was passed, and residing on the reservation, to an allotment, affected by the fact that allotments had been made to his ancestors under previous acts or treaties.

On Demurrer to Amended Bill.

Charles E. Clapp and Thomas L. Sloan, for complainant.
A. J. Sawyer and Chase & Comstock, for defendant.

SHIRAS, District Judge. On the 15th day of August, 1894, the congress of the United States enacted a statute reading as follows (28 Stat. 305):

"That all persons who are in whole or in part of Indian blood or descent, who are entitled to an allotment of land under any law of congress, or who claim to be so entitled to land under any allotment act or under any grant made by congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any act of congress, may commence or prosecute or defend any action, suit, or proceedings in relation to their right thereto, in the proper circuit court of the United States. And said courts are hereby given jurisdiction to try and determine any action, suit, or proceedings arising within their respective jurisdictions, involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty. And the judgment or decree of any such court in favor of any claimant to an allotment of land, shall have the same effect, when properly certified to the secretary of the interior, as if such allotment had been allowed and approved by him."

The present proceedings were instituted under the jurisdiction created by this act of congress, it being averred in the amended bill

95 F.—13

herein filed that Thomas L. Sloan, the complainant, is a member of the Omaha tribe of Indians, who occupy a reservation in the state of Nebraska; that he is of mixed white and Indian blood, being the son of William E. Sloan, now deceased, who was the son of Margaret Sloan, a daughter of Michael Barada, a white man, and Tagleha Hacieneda, an Indian woman of the Omaha tribe; that complainant and his ancestors have always maintained their tribal relations with the Omahas; that the complainant was educated at the expense of the United States at the Indian school at Hampton, Va.; that since the year 1880 complainant, with his grandmother Margaret Sloan during her lifetime, and with his wife, he being the head of a family, has occupied lots 5, 6, and 7 in section 26, lot 1 in section 35, in township 25 N., range 6 E., and the S. $\frac{1}{2}$ of the N. E. $\frac{1}{4}$ of section 20, township 24 N., range 8 E., and has put valuable improvements thereon; that complainant is entitled to have the premises by him thus occupied and improved set apart and allotted to him as a member of the Omaha tribe, under the acts of congress regulating the allotment of lands in severalty to members of that tribe; that this allotment has been refused him by the agents and officials of the land department, wherefore the complainant seeks the aid of the court for the protection of his rights, under the provisions of the act of congress already cited. To this bill a general demurrer is interposed on behalf of the United States, and in support thereof it is contended that, it appearing that the complainant had submitted his claim to an allotment in severalty to the land department, he should be held bound by the decision of the department; that the control of the Indian reservations and lands is committed to the interior department; and that the action thereof should be held to be final and conclusive.

The extent of the jurisdiction of courts over the rulings and decisions of the land department in the disposition of the public lands is well settled, and is stated in Moore v. Robbins, 96 U. S. 530, in the following terms:

"That the decision of the officers of the land department, made within the scope of their authority on questions of this kind, is in general conclusive everywhere, except when reconsidered by way of appeal within that department; and that as to the facts on which the decision is based, in the absence of fraud or mistake, that decision is conclusive, even in courts of justice, when the title afterwards comes in question; but that in this class of cases, as in all others, there exists in the courts of equity the jurisdiction to correct mistakes, to relieve against frauds and impositions, and, in cases where it is clear that those officers have, by a mistake of the law, given to one man the land which, on the undisputed facts, belonged to another, to give appropriate relief." Johnson v. Towsley, 13 Wall. 72; Shepley v. Cowan, 91 U. S. 340; Marquez v. Frisbie, 101 U. S. 473; Quinby v. Conlan, 104 U. S. 420.

In the exercise of the jurisdiction to give relief within the limits thus defined, courts will not take cognizance of a controversy over the title to particular premises, so long as the title thereto remains in the United States, but will only do so after the title has vested in a private party. Gaines v. Thompson, 7 Wall. 347; Secretary v. McGarrahan, 9 Wall. 298; Litchfield v. Richards, Id. 575; Marquez v. Frisbie, 101 U. S. 473.

It was doubtless the existence of this recognized and well-established rule, with respect to the public lands generally, that led to the adoption by congress of the act of August 15, 1894 (28 Stat. 305). A refusal on part of the land department to make an allotment of a particular tract or of a specified number of acres out of the reservation to a claimant would leave the title in the United States, and under the general rule, as laid down in the cases above cited, courts would refuse to exercise jurisdiction on behalf of the party claiming an allotment, so long as the title remained in the government. To remedy this difficulty, the act of August 15, 1894 (28 Stat. 305), was adopted, which creates a special jurisdiction in the courts, evidently intended to enable the courts to deal with the legal questions involved, and to settle the rights of parties seeking allotments in severalty, although the title to the land remains in the United States. Under the recognized rule applicable to the public lands of the United States, the courts would not take jurisdiction over contested rights thereto until, by action of the land department, the title had been vested in a private party; but under the act of August 15, 1894 (28 Stat. 305), the jurisdiction, in cases coming within the purview of the act, may be exercised while the title remains in the United States. With respect to contests between conflicting claimants under the pre-emption, homestead, or swamp-land acts, it is well settled that the decisions of the land department on questions of law are not conclusive, but the rulings thereon may be re-examined by the courts after the title has been vested by the land department in an individual; and under the provisions of the act of August 15, 1894 (28 Stat. 305), the same right with respect to allotments in severalty of Indian lands may be exercised by the court, although the title yet remains in the United States, and the fact that the land department may have passed upon the claim adversely to the claimant does not bar the jurisdiction of the court in the one case more than in the other; and the further argument of counsel for the United States that, as the management of Indian affairs is intrusted to the department of the interior, the court should not interfere therein, cannot be accorded weight, in view of the express provisions of the act of August 15, 1894 (28 Stat. 305), which was adopted for the purpose of affording to claimants who were refused recognition by the land department the opportunity to litigate their rights before a judicial tribunal. Furthermore, a decree in favor of a claimant under this act will not have the effect of removing either the claimant or the land from without the control of the interior department, as the act provides that the judgment or decree in favor of the claimant shall be certified to the secretary of the interior, and shall have the same effect as though the allotment had been allowed and approved by the secretary, and an allottee who establishes a legal right to an allotment in severalty by a decree of the court will be subject to the same laws and departmental rules that would obtain in case the allotment had been made by the land department. In view of the express provisions of the act of congress of August 15, 1894 (28 Stat. 305), it cannot be held that the action of the land department, in construing the treaties and acts of congress providing

for the allotment in severalty of lands in the Omaha reservation, is final and conclusive, and therefore the complainant has the right to demand the judgment of the court upon the legal questions involved in the determination of his claim to an allotment of the premises in the bill described.

Under the averments of the amended bill, it must be held to be true, as matters of fact, that the complainant is a member of the Omaha tribe, of mixed blood, and that since 1880 he has been a resident upon the reservation. The law now in force regulating the allotment in severalty of portions of the Omaha reservation is the act of congress approved August 7, 1882 (22 Stat. 341). This act recites that, by consent of the Omaha tribe of Indians, so much of their reservation in the state of Nebraska as lies west of the right of way granted to the Sioux City & Nebraska Railway Company was to be surveyed and sold, the proceeds to belong to the Indians, the purchasers to receive patents for the lands bought, it being provided that any right in severalty acquired by any Indian under existing treaties should not be affected by this act; and by section 5 it is further recited and enacted "that with the consent of said Indians as aforesaid the secretary of the interior be and he is hereby authorized, either through the agent of said tribe, or such other person as he may designate, to allot the lands lying east of the right of way granted to the Sioux City & Nebraska Railroad Company * * * in severalty to the Indians of said tribe in quantity as follows." Can any other construction be properly given to this act than that it was intended to take the place of all other acts or treaties on the subject of the allotment of lands in severalty within the Omaha reservation?

By the proviso therein contained, all rights in severalty which had vested under the previous laws were reserved from the operation of the act, but with this exception: This act of 1882 (22 Stat. 341) was clearly intended to take the place of all previous treaties or laws upon that subject. It decreased the territory within which allotments may be made. It enlarges the number of persons entitled to allotments over those provided for in the treaty of 1865, in that it does not limit allotments to male persons only, as is done in the treaty of 1865. It also changes the definition of the quantities of land to be allotted. In other words, the act deals so fully with the subject-matter that it must be held to be the only act now in force under which allotments can be made upon the Omaha reservation. The right of the complainant in this case must therefore be determined by the provisions of this act. It is true that, in construing the meaning of the act, light may be sought from the previous treaties had between the Indian tribe and the United States dealing with this subject-matter, but such reference to prior treaties is only to aid in properly construing the terms of the act now in force. The words used in the act are to be construed with reference to the situation as it existed when the same was passed.

Under the provisions of the previous treaties, some progress had been made in the matter of allotments in severalty, but it is evident that the parties in interest deemed it advisable to adopt a new basis

for these allotments. The act preserves the rights that had become vested under the previous treaties, but with reference to future allotments it declares the rule that must govern both as to parties entitled to allotments and as to the amounts to be selected. In these particulars the language of the act clearly shows that it was intended to change the rule existing under the previous treaties. It confers the right to an allotment upon the Indians of the Omaha tribe. It makes no discrimination with respect to the mixed bloods. It must have been well known to congress, as it unquestionably was to the Omaha tribe, that there were residing at that time upon this reservation, as members of the tribe, many persons of mixed blood, and, if it was the purpose of the parties to exclude from the benefit of the act all persons who were not Indians of pure blood, apt words to that end would have been used.

The parties to the contract evidenced by the act of 1882 (22 Stat. 341) were the Omaha tribe of Indians and the United States, and, as already said, that tribe included many mixed bloods, who were then residing on the reservation, and, under these circumstances, it was agreed and enacted that the allotments in severalty should be made "to the Indians of said tribe in quantity as follows." The act of 1882 (22 Stat. 341) deals with the situation as it existed at the date of its adoption, and there cannot be read into it limitations found in the previous treaties, but which are not repeated in the act itself. In view of the situation and the several provisions of the act, there may be good ground for holding that only those Indians residing on the reservation when the act of 1882 (22 Stat. 341) was adopted, and their after-born children, are or can become entitled to allotments under its provisions; but, whatever may be the true construction of the act in this particular, there seems to be no ground for holding that the act intended to exclude from its benefits any Indians of the Omaha tribe residing on the reservation at the date of the act. It is admitted that the complainant was in fact a resident of the reservation in 1882, when the act of August 7th of that year was approved, and, if he was an Indian of the Omaha tribe, then it must be held that he comes within the class of persons entitled to allotments in severalty under the act in question.

It is admitted that complainant is of mixed blood, being one-eighth Indian; that he was educated as an Indian, at the expense of the United States, at the school maintained at Hampton, Va.; and that since the year 1880 he has resided upon the reservation, and, under these facts, he must be held to be an "Indian," in the sense in which that term is used in the act of 1882 (22 Stat. 341). The fact that in blood he is but one-eighth an Indian cannot outweigh the other admitted facts, showing that he has been recognized to be an Indian of the Omaha tribe by the United States, and has always maintained his tribal relations with the Omahas.

It is further urged in argument that, in construing the act of 1882 (22 Stat. 341), the land department has uniformly held that the fifth section of the act of 1882 related back to the treaty of 1865, the sole purpose being to secure to the Indians a more perfect and satisfactory

title to their individual holdings; and that, as the treaty of 1865 provided that the allotments in severalty were to be made "to the members of the tribe, including their half or mixed blood relatives now residing with them," the same limitation must be read into the act of 1882 (22 Stat. 341). As already stated, this limited view of the purpose of the act of 1882 is not sustainable, and it cannot be held that only those persons residing on the reservation in 1865 are entitled to the benefits of the act of 1882 (22 Stat. 341).

It is further urged in argument that the father of complainant and his grandmother obtained allotments in severalty of lands in Nemaha county. Under the provisions of the treaty of July 15, 1830 (7 Stat. 328–330), by convention between the Omaha and other Indian tribes and the United States, a large tract of country in Nebraska known as the "Nemaha Reservation" was set apart for the accommodation, use, and benefit of the mixed bloods of the named tribes, and it is contended that, because of these alleged allotments to the father and grandmother of complainant, the latter is barred of any right to an allotment, under the act of 1882 (22 Stat. 341). It is not claimed that any allotment of land in the Nemaha reservation has ever been made to the complainant, so that the case does not present the question whether a person who has had an allotment in the one reservation can demand a second allotment in the other.

The complainant's right, if any he has, to an allotment under the act of 1882 (22 Stat. 341), is not inherited from his father or other ancestors. If it exists, it is because he is an Indian of the Omaha tribe residing on the Omaha reservation. It is a personal right, conferred on him by reason of his being an Indian of the Omaha tribe. If complainant possesses the right to an allotment, this right never belonged to his father or any other of his ancestors, but it is conferred upon him by the act of congress because he is an Indian of the Omaha tribe. The complainant is not seeking in this proceeding to assert a right to any property heretofore owned by his ancestors. He is asserting a right to an allotment in severalty out of premises belonging in common to the Omaha tribe of Indians, and he bases his claim upon the provisions of the act of congress of 1882 (22 Stat. 341), which act was passed for the benefit of the Omaha tribe of Indians then residing upon the reservation. Under the averments of fact in the bill contained, it must be held that the complainant is an Indian of the Omaha tribe, and that he was, when the act of 1882 (22 Stat. 341) was adopted, and still is, a resident upon the reservation. If these averments are true, then complainant shows himself entitled to the benefits of the act, and to an allotment in severalty, in accordance with the terms of the act. The demurrer to the amended bill is therefore overruled, with leave to defendant, if so advised, to answer the bill by the August rule day.